**UNITED STATES DISTRICT COURT**
**DISTRICT OF MONTANA**
**BILLINGS DIVISION**

| | |
|---|---|
| CALLIE DRELL, Individually and on behalf of THE FIRST INTERSTATE BANCSYSTEM, INC. 401(K) PLAN, and on behalf of all the similarly situated participants and beneficiaries of the plan,<br><br>Plaintiff,<br><br>v.<br><br>FIRST INTERSTATE BANCSYSTEM, INC. and the FIRST INTERSTATE BANCSYSTEM, INC. BENEFITS COMMITTEE,<br><br>Defendants. | **Case No. CV-26-62-BLG-TJC**<br><br>**CLASS ACTION COMPLAINT** |

## I. INTRODUCTION

1. Plaintiff Callie Drell ("Plaintiff"), individually, and on behalf of all other similarly situated participants, their beneficiaries and estates, and on behalf of the First Interstate BancSystem, Inc. 401(k) Plan ("the Plan"), brings this action under 29 U.S.C. §§ 1132(a)(2) and (3) against Defendants First Interstate BancSystem, Inc. (the "Company"), and The First Interstate BancSystem, Inc. Benefits Committee (the "Committee") (collectively, the Company and the Committee will be referred to as "Defendants" or "Fiduciaries"), to remedy

Defendants' breaches of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974, as amended (ERISA), 29 U.S.C. § 1001, *et seq*.

2. Defined contribution plans that are qualified as tax-deferred vehicles have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, defined contribution plans operate in a manner by which participants bear the risk of high fees and investment underperformance.

3. As fiduciaries to the Plan, at all times relevant to this Complaint Defendants were obligated to act (1) prudently and (2) for the exclusive benefit of participants and beneficiaries. Defendants violated their fiduciary duties by both (1) initially selecting; and (2) consistently retaining the American Century Target Date Fund (the "AC TDF") for more than nine years, even when it glaringly underperformed under all investment metrics and, consequently, in terms of returns. This lower-performing investment option reduced Plan participants' retirement funds by tens of millions of dollars as compared to if Defendants did not breach their fiduciary duties.

4. Plaintiff brings this action to obtain the relief provided under 29 U.S.C. § 1109, for losses suffered by the Plan resulting from the Defendants' fiduciary breaches described below, and for other appropriate equitable and injunctive relief under 29 U.S.C. § 1132(a)(3).

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(2).

6. Venue is proper in this judicial district pursuant to 29 U.S.C. § 1132(e)(2) because Defendant First Interstate BancSystem, Inc. resides in this District (in Billings, Montana), and the breach of fiduciary responsibility occurred in this District.

## III. THE PARTIES

7. At relevant times, Plaintiff, by virtue of Plaintiff's employment with the Company and participation in the Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches of fiduciary duty and ERISA violations.

8. Thus, Plaintiff is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

9. At relevant times during the Class Period, Plaintiff was invested in the AC TDF series.

10. As a result of the Defendants' mismanagement of the Plan and violations of ERISA, and in particular Defendants' inclusion of the AC TDF, Plaintiff was subject to underperformance and suffered financial losses.

11. Plaintiff has standing to bring this action on behalf of the Plan because she participated in the Plan and was injured by Defendants' unlawful conduct. Plaintiff is entitled to receive benefits in the amount of the difference between the value of her account currently, or as of the time her account was distributed, and what her account is or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

12. As a result of the Defendants' mismanagement of the Plan and violations of ERISA, and in particular Defendants' inclusion and retention of the AC TDFs, Plaintiff was subject to underperformance and suffered financial losses.

13. At all relevant times, the Company's principal office was located in Billings, Montana, with an address at 401 N. 31st Street, Billings, Montana 59101. The Company has over 3,000 employees.

14. At all relevant times the Company was and is the named fiduciary and sponsor of the Plan per 29 U.S.C. § 1002(16)(B) and 29 U.S.C. § 1102(a); and a Plan fiduciary under 29 U.S.C. § 1002(21)(A), to the extent that it appointed co-

fiduciaries and otherwise exercised discretion over the administration and management of the Plan and/or control of Plan assets.

15. At all relevant times, the Committee members were fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A), to the extent that they had or exercised discretionary authority respecting the administration or management of the Plan, and/or control of Plan assets. At all relevant times, each Defendant was one or more of the following: (1) a party in interest under 29 U.S.C. § 1002(14)(A); (2) a Plan fiduciary under 29 U.S.C. § 1002(21)(A), to the extent they had or exercised discretion over the administration or management of the Plan and/or control of Plan assets; and/or (3) a named fiduciary under the Plan.

## IV. THE PLAN

16. The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401(k).

17. The Plan was established to provide eligible employees with the opportunity to accumulate retirement savings over a long period through the sum of employee and employer contributions and associated investment earnings minus associated expenses.

18. The Plan is a defined contribution plan covering all eligible employees of the Company and participating subsidiaries. Participants of the Plan can elect to make tax-deferred contributions upon eligibility.

19. The Defendants control and manage the operation and administration of the Plan. The Defendants have fiduciary responsibility for the investment of the assets of the Plan.

20. The Plan is subject to the provisions of ERISA.

21. From the beginning of the Class Period[1] through the end of 2024 the Plan total assets were between $304 million and $481 million. As of the end of 2024, the Defendants managed over $481 million in Plan assets for 3,478 active participants.

22. Upon information and belief, in light of the size of the Plan at all times relevant to the Class Period, the Plan had access to a wide array of plan investment options and Defendants had the ability to investigate and monitor the Plan's investments.

## V. DEFENDANTS' FIDUCIARY OBLIGATIONS

23. ERISA imposes strict fiduciary duties upon the Defendants as fiduciaries of the Plan, including the duty of prudence. These duties apply to all

[1] As used herein, "Class Period" refers to the six years prior to the filing of this Complaint.

fiduciary acts, including the Defendants' selection and retention of investment options for the Plan.

24. ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B).

25. As part of their fiduciary duty, Defendants "ha[ve] a continuing duty to monitor [Plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* at 530. If an investment is imprudent, Defendants "must dispose of it within a reasonable time." *Id.* (citation omitted).

26. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.

27. Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.

# VI. FACTUAL ALLEGATIONS

## A. Defendants violated ERISA's fiduciary duty of prudence by selecting and retaining the American Century Target Date Funds

28. The circumstances of Defendants' breaches with respect to the AC TDFs are straightforward. The AC TDFs dominated the Plan throughout the Class Period; prudent fiduciaries had readily available industry-leading TDF comparators against which to evaluate them; those comparators showed by 2020 that the AC TDFs were persistently inferior under MPT metrics, including risk adjusted analysis, manager performance, cost, and returns; and Defendants nevertheless retained the AC TDFs for years.

### i. Background on Target Date Funds

29. In a recent report to Congress, the U.S. Government Accountability Office ("GAO") noted that Target date funds (TDFs) are widely offered and have become the most popular investment option used by 401(k) plan participants.[2] TDFs allocate assets over time based on participants' targeted retirement dates. Plan sponsors often choose TDFs as their default investment because TDFs offer a "set it and forget it" option for participants.

30. The investment objective of a target date fund series is to provide an asset allocation strategy that changes its asset allocation over time as investors get

[2] Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), https://www.gao.gov/assets/870/868017.pdf (last accessed June 24, 2026).

closer to their expected retirement date. The name of each fund in a target date series typically refers to its target date, which corresponds approximately to the investor's anticipated retirement date. For example, a fund with a name like "Retirement Fund 2040" or "Target 2040" is designed for individuals who intend to retire in or near the year 2040. Target retirement years are often offered in five-year increments. The specific retirement date of a fund in a target date series is often referred to as a "vintage." For example, funds in a target date fund series for plan participants expected to retire around 2040 would typically be referred to as the 2040 vintage of that series while the fund in a target date fund series for plan participants expected to retire around 2030 would typically be referred to as the 2030 vintage target for that specific target date fund series.

31. American Century Investments ("AC") is an investment management company that created and manages the American Century One Choice target date fund series (hereafter "AC TDF"). Like most target-date fund series, the AC TDF is structured as a "fund of funds," which means that each vintage invests in other American Century proprietary funds rather than individual securities. For example, each vintage in the AC TDF may be invested in differing proportions of proprietary AC equity funds, bond funds, real estate funds, and money market funds. In other words, each vintage of the AC TDF invests in a combination of proprietary AC mutual funds to provide varying exposure to a mix of asset classes such as U.S.

stocks (large-caps and small-caps), international stocks, U.S. bonds, international bonds, investments linked to real estate, and cash-equivalent securities. These asset classes can be further categorized generally as allocations to equities or as allocations for fixed income.

32. Each equity allocation is intended to provide exposure to a specific market segment. Typically, those segments include U.S. large-, mid- and small-capitalization companies and international (non-U.S.) developed and emerging markets. The portfolio manager's aim should be to build a portfolio that provides exposure to factors commonly tied to a stock's potential for enhanced risk-adjusted returns relative to the market.

33. Each fixed income allocation is intended to provide diversified exposure across a wide range of market sectors, including U.S. government obligations, corporate investment grade and below investment grade bonds (commonly known as "high yield bonds" or "junk bonds"), other U.S. aggregate bond sectors (including mortgage- and asset backed securities), and emerging market and international fixed income issues. The portfolio manager's aim is to provide broadly diversified fixed income exposure and construct a portfolio to enhance issuer diversification and liquidity.

34. Under ERISA, the asset allocation for each vintage of a target date fund series is required to be consistent with the prudent investor standard which incorporates Modern Portfolio Theory ("MPT").

35. TDFs seek to achieve their objectives by rebalancing assets over time to become less focused on growth (lowering their allocation to stocks) and more focused on preservation (raising their allocation to bonds) as the fund approaches and passes the target date. The asset mix between equity and fixed income shifts dynamically over time, becoming less risky over a person's working career and into retirement. The transition from higher risk to lower risk is often referred to as the "glide path."

36. For example, Figure 1 below illustrates Morningstar's calculation of the average glide path over time from 2010 to 2024.

**Figure 1**




[3]

37. TDF glide paths are often categorized as managed either "to" or "through" retirement. In general, historically a "to retirement" glide path generally assumed participants withdraw their funds once they reach the presumed retirement age, or soon thereafter, and tend to have less equity exposure at retirement. Similarly, in general, the asset allocation of a "to retirement" TDF historically remained static once the retirement date is reached. A "through retirement" glide path generally

[3] Morningstar 2025 Target-Date Fund Landscape, April 2025, page 24.

expects participants will remain invested after reaching retirement and gradually draw down on their funds. Accordingly, the terminal allocation of a "through retirement" TDF is not reached until a predetermined number of years after the target date.

38. However, these distinctions and categorizations are somewhat arbitrary. In reality, Morningstar has found that "in practice, there doesn't appear to be a large difference in how investors use the different glide-paths."[4] In fact, for example, some "to retirement" glide paths, like the AC TDF series, have more or similar equity exposure at retirement than some "through retirement" glide paths.

39. Indeed, as explained in detail below, even American Century deems it acceptable to compare the AC TDF series to both "to" and "through" glide path TDFs, because American Century states that Morningstar's TDF peer group is appropriate, despite the fact that it includes TDFs with both types of glide path.

40. Moreover, as illustrated in Figure 1 above, over time most retirement plan asset managers have understood that, under the circumstances prevailing prior to and at the start of the Class Period as well as now, static asset allocations for plan participants around age 65 are less consistent with Modern Portfolio Theory.

[4] Pacholok & Zaya, 2022 Target-Date Strategy Landscape, Morningstar Manager Research, at 37 (Mar. 23, 2022).

41. Further, while TDFs are sometimes considered differentiated by whether they consist of index (passive) funds or active funds, in fact all TDFs are actively managed because of the continuous work of shifting the asset allocation of each vintage along the glide path.

42. Accordingly, as described below in more detail, the minimum standard of care for prudent plan fiduciaries making investment decisions under the prudent investor standard requires a fiduciary to consider investment options other than only a small subset of the available options when selecting or monitoring a target date fund series.

43. Additionally, while the specific details of glide paths vary somewhat across different TDF series, they are all constrained by Modern Portfolio Theory and, as a result, they all compete with each other for investment dollars. Over the years, it has become clear that some glide paths are better than others. This is illustrated by the change in the average glide path illustrated above as well as net fund flows out of inferior glide paths and into superior glide paths.

44. Further, because most plan fiduciaries designate the selected TDF as the qualified default investment alternative ("QDIA") under ERISA, the TDF selected by a plan fiduciary will typically contain the lion's share of the assets of most plan participants. For this reason, the selection of a TDF series as the QDIA by

a plan fiduciary is often the most important and impactful of all its investment selection and monitoring responsibilities.

45. For example, in this case the AC TDF comprised between 47% and 51% of the Plan's assets from 2020 through 2024.

46. Unlike most of the equity and fixed income asset categories that comprise the underlying investments contained in TDFs for which there are often several scores of alternatives, there are far fewer TDF options. For example, in 2024, there were only 37 established TDFs that had a 15-year track record. A closer look reveals that, as shown in Figure 2 below, assets are highly concentrated in the top 5 largest TDFs, which accounted for 80% of all TDF-invested dollars as of 2024, and that among these top 5, the Vanguard TDF series contains more than double the assets of the next largest TDF series.

**Figure 2**



[5]

47. The same was true at the beginning of the class period in 2020 with the Vanguard, T. Rowe Price, BlackRock, and Capital Group comparators in this action harboring 65% of the TDF market invested money through the class period.

[5] Morningstar 2025 Target-Date Fund Landscape, April 2025, page 13.

**Figure 3**

**Exhibit 13** The 10 Largest Target-Date Providers

| | | Assets (USD in Billions) | | | Market Share | |
|---|---|---|---|---|---|---|
| Firm | Target-Date Series | Mutual Fund | CIT | Total TDF | 2021 | 2020 |
| **Vanguard** | | | | 1,190 | 36.4% | 36.7% |
| | Vanguard Target Retirement | 660 | 530 | | | |
| **Fidelity** | | | | 460 | 14.1% | 13.3% |
| | Fidelity Freedom | 221 | — | | | |
| | Fidelity Freedom Index | 106 | 46 | | | |
| | Fidelity Freedom Blend | 11 | 55 | | | |
| | Fidelity Advisory Freedom | 21 | — | | | |
| | Fidelity Flex Freedom Blend | <1 | — | | | |
| | Fideity Managed Retirement | <1 | — | | | |
| **T. Rowe Price** | | | | 374 | 11.5% | 11.6% |
| | T. Rowe Price Retirement | 180 | 170 | | | |
| | T. Rowe Price Target | 4 | 1 | | | |
| | T. Rowe Price Retirement Hybrid | — | 16 | | | |
| | T. Rowe Price Retirement Blend | <1 | 4 | | | |
| **BlackRock** | | | | 289 | 8.8% | 9.5% |
| | BlackRock LifePath Index | 61 | 226 | | | |
| | BlackRock LifePath Dynamic | 1 | 1 | | | |
| | BlackRock LifePath ESG Index | <1 | — | | | |
| **American Funds** | | | | 248 | 7.6% | 7.2% |
| | American Funds Target Date Retirement | 239 | 9 | | | |

48. The significant market share among TDF market leaders is primarily the result of investors moving away from clearly inferior TDF products, like the AC TDF chosen by Defendants in this case, and into superior alternatives.

49. The net flow into a particular target date series is the sum of contributions from existing investors, withdrawals from existing investors, and the net result of transfers by fiduciaries from one inferior target date series to a new superior target date series. Investors and plan fiduciaries have been making decisions

that indicate they have concluded that the AC TDF is inferior. For instance, in 2024 the AC TDF series experienced net outflows of almost $4 billion. This represented a loss of more than 19% of its total assets under management. In contrast, for example, the American Funds/Capital Group target date series experienced over $16 billion in net inflows.

50. As noted above, all TDFs compete for selection by plan fiduciaries and are compared against each other despite some slight differences in glide paths. Indeed, "peer comparison is one of the most widely used and accepted methods of equity analysis used by professional analysts, individual investors, and professionals."[6]

51. Unlike the mutual fund market, the TDF market is too small and concentrated for plan fiduciaries to fail to compare their selected options against the market leading and established available options. In other words, while there are some differences between, *e.g.*, the T. Rowe Price and Vanguard TDFs, prudent fiduciaries compare and consider these two as well as other options when making their selections and deciding whether to retain or remove a selected TDF series.

52. Further, over time as prudent fiduciaries have continued to evaluate and analyze the differences in the glide paths of each TDF series, the superior glide paths have attracted more assets and most TDFs with underperforming glide paths have

---

[6] *See* https://www.investopedia.com/terms/p/peer-group.asp (last visited June 1, 2026).

revised their glide paths to be more like the superior options. In other words, over time the variance between the glide paths of the TDF series have decreased and those that continue to be outliers have experienced underperformance.

53. Moreover, since participants can choose and switch their vintage there is no equity allocation that the AC TDF provides that the alternatives do not offer as well. In fact, there is only a range of equity allocations that the alternatives provide and the AC TDF does not—such equity allocations lower than 45% and higher than 85%. A hypothetical participant that would like the lowest equity allocation would get lower equity exposure from the alternatives than the AC TDFs.

**ii. The Standard of Care for Prudent Fiduciaries Selecting and Retaining a TDF Series**

54. ERISA's fiduciary duty of prudence requires that fiduciaries must act in accordance with the prudent investor standard when making decisions related to plan investments. This means that in order to be prudent, fiduciaries are required to follow accepted investment theories and prevailing investment industry practices. *Tibble v. Edison Int'l*, 575 U.S. 523, 529-30 (2015); *see also* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-

responsibilities.pdf. For the last several decades, the most accepted investment theory is the Modern Portfolio Theory ("MPT") which has been incorporated into the prudent investor standard.

55. A prudent TDF selection and monitoring process considers a wide array of metrics commonly accepted and incorporated in MPT that allow the fiduciary to properly assess the prudence of any potential TDF series.

56. A prudent process considers all the metrics and circumstances present at the time of the selection/retention/removal decision in order to evaluate whether the TDF should be selected or retained.

57. Accordingly, the minimum standard of care for prudent plan fiduciaries selecting and retaining investment options to be made available for plan participants always requires an analysis of the risk-adjusted performance of the selected or retained investment options.

58. While the selection of a target date series is a bit more complex than the selection of a single-strategy investment option, retirement plan experts have also developed a minimum standard of care with respect to the selection and retention of target date series.

59. The most critical criteria for selecting and retaining target date fund series are performance, risk (which incorporates risk-adjusted performance), fees, and the "glide path" dynamic asset allocation (also sometimes called "portfolio

construction”). These quantitative criteria are also supplemented with some qualitative criteria that are often merely proxies for an increased risk of future underperformance, *e.g.*, a change in the investment manager’s ownership or key personnel, a shift in the investment manager’s philosophy or process, or the investment manager’s involvement in litigation or fraud allegations.[7]

60. In other words, the qualitative criteria primarily provide reasons to not select (or eliminate) a TDF series from a plan even if performance was good at that moment. At the end of the day, however, risk-adjusted performance is the primary and most important criteria. Even the fees are essentially a proxy for performance because lower fees correlate with higher performance.

61. And of course, the actual performance of an investment is the most important criteria to the investor (plan participant) and is accordingly always considered when evaluating a target date series. And because each target date series might incorporate a glide-path that takes on relatively more (or less) risk, the risk-adjusted performance metrics are relatively more important for comparing and benchmarking target date series.

[7] *See* Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), p. 50, https://www.gao.gov/assets/870/868017.pdf (last accessed July 18, 2026); *See also* CAPTRUST’s “Best Practices for Target Date Fund Selection, https://www.captrust.com/wp-content/uploads/2019/05/tdftips.pdf (last accessed January 20, 2026); Callan Institute, Defined Contribution Trends Surveys 2017-2020, 2022.

62. As discussed above, when evaluating the risk-adjusted performance and quality of investment managers, the minimum standard of care for prudent plan fiduciaries incorporates standard metrics from MPT. The most important of these criteria include, but are not limited to, the following metrics over three- and five-year trailing periods:

- Alpha: A measure of the difference between a portfolio's actual returns and its expected performance, given its level of risk as measured by beta. A positive Alpha indicates the portfolio has performed better than its beta would predict. In contrast, a negative Alpha indicates the portfolio has underperformed, given the expectation established by beta.[8]
- Sharpe Ratio: A risk-adjusted returns measure developed by William Sharpe. The Sharpe Ratio is calculated over each time period by dividing a fund's annualized excess returns by the standard deviation of a fund's annualized excess returns to determine reward per unit of risk. The Sharpe Ratio can be used to compare two funds directly on how much risk each had to bear to earn excess return over the risk-free rate.[9] Notably, American Century identifies the

---

[8] *See* Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), p. 70-1, https://www.gao.gov/assets/870/868017.pdf (last accessed July 18, 2026)

[9] *See id.* at 71.

Sharpe Ratio as a meaningful investment metric in its marketing materials. *See* https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-target-date-portfolios/ (last accessed February 20, 2026) ("Portfolios with higher Sharpe Ratios tend to provide more return for the same amount of risk as portfolios with lower Sharpe Ratios").

- Sortino Ratio: Similar to the Sharpe ratio, the Sortino Ratio (developed by Frank Sortino) uses only the downside risk portion of the standard deviation in the denominator.[10]

63. Some other relevant metrics include the following:

- Information ratio ("IR"): a metric that helps the investor evaluate whether the manager of the investment is beating a specific benchmark. An IR above 1.0 is evidence of excellent performance with consistent outperformance of the specific benchmark; an IR between 0.5 and 0.99 is evidence of reasonable manager skill; an IR of below 0.5 is evidence of weak performance as compared to the specific benchmark; and a negative value IR is evidence of consistent underperformance relative to the benchmark.

[10] Government Accountability Office, *GAO-24-105364, 401(k) Retirement Plans – The Department of Labor Should Update Guidance on Target Date Funds* (March 2024), p.71, https://www.gao.gov/assets/870/868017.pdf (last accessed July 18, 2026).

- Batting Average ("BA"): is a measure of a manager's ability to consistently beat the market. It is calculated by dividing the number of months in which the manager beat or matched the fund's primary benchmark index by the total number of months in the period. For example, a manager who meets or outperforms the market every month in a given period would have a batting average of 1.000. A manager who beats the market half of the time would have a batting average of .500.
- Turnover Ratio: is the percentage of a mutual fund or other portfolio holdings that have been replaced in the course of one year. Since a fund with a higher turnover ratio will have higher trading fees and short-term capital gains taxes, a portfolio manager with a higher turnover ratio will need to ensure that those trades are generating positive returns in excess of the additional costs.

64. Additionally, the minimum standard of care for prudent plan fiduciaries selecting and retaining a TDF series requires a comparison of the risk-adjusted performance.[11] In other words, to satisfy the minimum standard of care under the

[11] *See* 29 C.F.R. §2550.404a-1 ("Investment Prudence Duties" shall include is not necessarily limited to "[a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties) or menu, to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action compared to the opportunity for gain (or other return) associated with reasonably available alternatives with similar risks.")

circumstances then prevailing both prior to and throughout the Class Period, a prudent fiduciary should have considered a comparison of available peer alternatives.[12]

65. Accordingly, a prudent plan fiduciary, when determining whether to retain a Target Date Fund series, would evaluate and compare the performance and commonly accepted investment performance metrics such as the ones identified above to meaningful benchmarks including at the very minimum the industry leading peer alternative target date options.

66. Prior to and throughout the Class Period prudent plan fiduciaries had access to a tremendous amount of information to evaluate the performance of the AC TDF series in comparison to the industry leading alternative options.

67. Additionally, the prudent evaluation process requires an evaluation of all various "preferences" with respect to various target date fund series. In other words, the selection of a "through" versus a "to" TDF series or an "active" versus a "passive" TDF series is a fiduciary decision in and of itself. Similarly, the selection of a TDF series incorporates and requires the selection of the glide path of that TDF series which is also a separate fiduciary decision in and of itself. Arbitrary limitation

---

[12] *See*, the Target Date Benchmarking section of the Callan Institute, Defined Contribution Trends Surveys 2017-2020, 2022.

to only consider "to" or "through" options, or only "active" and not "passive" is imprudent.

68. For instance, hypothetically, if all "passive" TDF series consistently underperformed all "active" TDF series then it would be imprudent to limit the selection process to "passive" options because there may be something inherently imprudent in the universe of "passive" options. The same goes for choosing a "to" TDF series versus a "through" series. Moreover, there is a lot of overlap in the glide paths of "to" versus "through" glide paths and since many of the categorizations are arbitrary, a prudent fiduciary would consider the entire universe of TDFs as opposed to a limited subset.

69. Accordingly, a prudent plan fiduciary is required to evaluate not only whether a particular preference is prudent under the circumstances then prevailing but also whether specific options that incorporate or do not incorporate those preferences are prudent. In other words, a prudent plan fiduciary would be required to conduct an evaluation of the differences between various preferences to determine and ensure that those preferences were, in fact, prudent.

70. For example, as set forth below in Figure 4, prior to and throughout the class period several plan fiduciaries who had previously selected the AC TDF series determined that it was no longer prudent and removed the AC TDF series labeled "Active"/"To" and replaced them with a wide array of TDFs carrying other labels—

"Active"/"Through," "Passive"/"Through," and "Passive"/"To", **most of which switched to the comparator TDFs identified in this Complaint**, e.g., the American Funds Target Date Series (Active/Through) and the Vanguard Target Retirement Series (Passive/Through).

**Figure 4**

**Plans That Removed AC TDFs (Active; To) in Favor of Other Options**

| Plan Name | Replaced With | Year of Change |
|---|---|---|
| LHC Group 401(k) Plan | BlackRock LifePath Index **(Passive; To)** | 2019 |
| IBEW Local Union No. 252 Def Contrib Plan 401K Plan | American Funds Target Date Funds **(Active; Through)** | 2019 |
| ADAMS KEEGAN RETIREMENT SAVINGS PLAN | John Hancock Lifetime Blend **(Active/Passive Blend; Through)** | 2020 |
| ECS Federal, LLC 401(k) Plan | Vanguard Target Retirement Funds **(Passive; Through)** | 2020 |
| Opko Health, Inc. 401(k) Plan | Vanguard Target Retirement Funds **(Passive; Through)** | 2020 |
| Quinn Emanuel Urquhart & Sullivan, LLP 401(k) Plan | American Funds Target Date Funds **(Active; Through)** | 2021 |
| Mccormick Barstow 401(k) Retirement Plan | American Funds Target Date Funds **(Active; Through)** | 2021 |
| The Marvin Companies Profit Sharing and 401(k) Plan | American Funds Target Date Funds **(Active; Through)** | 2024 |
| Midmark Corporation 401(k) Savings Plan | T. Rowe Price Retirement Funds **(Active; Through)** | 2024 |
| Maher Terminals LLC Profit Sharing and 401(k) Plan | Vanguard Target Retirement Funds **(Passive; Through)** | 2024 |
| Digi-Key Corporation 401(k) Profit Sharing Plan | MercerWise Target Date Trusts **(Active; Through)** | 2024 |

### iii. The AC TDFs performed poorly compared to industry-leading TDF alternatives

71. Practically speaking, prior to and throughout the Class Period, in the TDF market with limited options, a prudent plan fiduciary would always consider

and compare, at a minimum, the Capital Group Target Retirement Series (also known as "American Funds"), the Vanguard Target Retirement Series, the T. Rowe Price Target Series, and the BlackRock LifePath Index series with any other potential TDF series because these have consistently outperformed most alternatives when evaluated by the prudent MPT process and are accordingly among the most often selected TDF options.

72. The "to" or "through" label does not, by itself, indicate substantial differences in real-world metrics, aims, risks, or rewards between the "to" and "through" paths. The AC TDF has no meaningful differences from the leading TDF options that would render it incomparable for purposes of evaluating its prudence. In practice, these labels are imprecise, if not arbitrary, and carry little weight when measured against actual MPT metrics for risk and return. Thus, it is not surprising that numerous plans that held the poorly performing AC TDFs moved to these options regardless of label conformity as demonstrated in Figure 4.

73. The AC TDF is and was not a conservative option that offered any meaningful protection against sell-off markets—which is even more apparent below when properly applying MPT metrics that adjust for risk and examine manager performance and more.

74. The figure below reports each series' equity allocation at the target retirement date and total return during the COVID-driven market sell-off in the first quarter of 2020.

**Figure 5**
**Equity Allocation at Retirement and Q1 2020 Performance for the Five Largest "To" and "Through" Target-Date Series**

In 2020's first quarter, for instance, the median 2020 "through" vintage lost 10.7% versus 7.6% for its "to" counterpart. Exhibit 38 shows the target equity allocation at retirement and the performance of the five largest "through" and "to" series during the selloff.

**Exhibit 38** To vs. Through Performance During 2020's First Quarter

| Glide Path Type | Series | Equity Allocation at Retirement (%) | Return Q1 2020 (%) |
|---|---|---|---|
| **Through** | Vanguard Target Retirement | 50 | -10.74 |
| | Fidelity Freedom | 52 | -12.34 |
| | American Funds Target Date Retirement | 46 | -8.85 |
| | T. Rowe Price Retirement | 55 | -14.21 |
| | Fidelity Freedom Index | 52 | -10.06 |
| | **Median** | **52** | **-10.74** |
| **To** | BlackRock LifePath Index | 40 | -7.59 |
| | American Century One Choice | 45 | -10.15 |
| | JPMorgan SmartRetirement | 31 | -9.40 |
| | Voya Index Solution | 35 | -5.22 |
| | USAA Target Retirement | 35 | -7.60 |
| | **Median** | **35** | **-7.60** |

Source: Morningstar Direct. Data as of Dec. 31, 2021.

75. Three of the four comparators pleaded below are all included in Figure 5 and all four are a meaningful benchmarks for the AC TDFs.

76. First, the Capital Group/American Funds Target Date Retirement Series ("American Funds TDF") is, like the AC TDF, an actively managed, fund-of-funds series classified by Morningstar in the same vintage-specific Target-Date 20XX

Categories that align vintage-for-vintage with the AC TDF series.[13] Notwithstanding the "through-retirement" label carried by the American Funds TDF, the American Funds TDF and the AC TDFs share materially similar risk and asset-allocation characteristics at the time of greatest fiduciary concern—the date of retirement. According to Morningstar's *2022 Target-Date Strategy Landscape*, the American Funds TDF held a 46% equity allocation at retirement, while the AC TDF held a 45% equity allocation at retirement—a difference of one percentage point.

77. Second, the Vanguard Target Retirement Series ("Vanguard TDF") is the largest TDF series in the United States by assets under management, used by tens of thousands of ERISA plans, and classified by Morningstar in the same vintage-specific Target-Date 20XX Categories as the AC TDFs. At retirement, the Vanguard TDF with its "through-retirement" label holds a 50% equity allocation—a mere five-percentage-point difference from the AC TDF's 45% landing point. The "to" versus "through" label did not change the outcome. Participants in the AC TDF and participants in Vanguard TDF experienced statistically indistinguishable drawdowns under the most stress-testing market event of the Class Period.

---

[13] Morningstar's Target-Date taxonomy assigns each vintage of a target-date fund series to a vintage-specific Morningstar Category named for the fund's target retirement year. The vintage-named Target-Date Morningstar Categories are: Target-Date 2000–2010, Target-Date 2015, Target-Date 2020, Target-Date 2025, Target-Date 2030, Target-Date 2035, Target-Date 2040, Target-Date 2045, Target-Date 2050, Target-Date 2055, Target-Date 2060, and Target-Date 2065+. *See* Morningstar Category Classifications: U.S. Funds (Oct. 2025), at 2, 28–31. As used herein, "Target-Date 20XX" refers to those vintage-named Categories collectively, where the "XX" stands in for the specific vintage year—*i.e.*, the AC TDF 2030 fund and the Vanguard 2030 fund are each classified in the Target-Date 2030 Category, the AC TDF 2035 fund and the Vanguard 2035 fund are each classified in the Target-Date 2035 Category, and so on across all vintages.

78. Third, the T. Rowe Price Target Series ("TRP TDF")[14] is like the AC TDFs, an actively managed, fund-of-funds TDF series classified by Morningstar in the same Target-Date 20XX Categories. With its "through-retirement" label, the TRP TDF holds a 42.5% equity allocation at retirement—2.5% below the AC TDF's 45%.

79. Fourth, the BlackRock LifePath Index Target Retirement Series ("BlackRock LifePath") shares the same fund-of-funds structure as the AC TDFs and comparators before it as well as the "to-retirement" categorization as the AC TDF. Like the AC TDF, the BlackRock LifePath series follows a glide path that reaches its terminal equity allocation at the target retirement date and remains static thereafter. BlackRock LifePath holds a 40% equity allocation at retirement—five percentage points below the AC TDF's 45%.

80. The AC TDFs sit inside the comparator band on both metrics. By equity allocation at retirement (the most important point for risk): BlackRock LifePath 40%, TRP TDF 42.5%, AC TDFs 45%, American Funds TDF 46%, Vanguard TDF 50%. By Q1 2020 drawdown: BlackRock LifePath -7.59%, American Funds TDF -8.85%, AC TDFs -10.15%, Vanguard TDF -10.74%. Three are "through" funds and two are "to" funds; the labels neither predict nor explain where AC TDFs sit on either metric. Whatever categorical labels apply, the actual asset-allocation and risk experiences of participants in the AC TDF mirror those in the comparator series.

---

[14] Not included in figure 5 as it is a variation of the TRP TDF included in figure 5

81. The medians shown in Figure 5 tell the same story and compel the same conclusion. The median "through" series held 52% equity at retirement and lost 10.74% in Q1 2020; the median "to" series held 35% equity and lost 7.60%.[15] The AC TDFs' 45% and -10.15% sit closer to the "through" median than to the "to" median on both metrics despite the series' "to" label. In other words, these marketing labels are of limited significance, especially to fiduciaries.

82. The same conclusion follows from how the target-date industry itself groups and evaluates these funds. Morningstar's peer-group classifications, and American Century's own marketing comparisons, both treat cross-label target-date comparisons as appropriate.

83. Morningstar classifies each vintage of the AC TDF series in the same Morningstar Category as the corresponding vintages of the comparator series—the "Target-Date 2030" category for the 2030 vintage, "Target-Date 2040" for the 2040 vintage, and so on through the lifecycle. Morningstar's official category definition for the Target-Date 2030 vintage states:

> Target-date portfolios provide diversified exposure to stocks, bonds, and cash for those investors who have a specific date in mind (in this case, the years 2026-30) for retirement. These portfolios aim to provide investors with an optimal level of return and risk, based solely on the target date. Management adjusts the allocation among asset classes to more-conservative mixes as the target date approaches, following a preset glide path. A target-date

[15] Pacholok, *supra* note 4, at 38.

> portfolio is part of a series of funds offering multiple retirement dates to investors.

Morningstar Category Classifications: U.S. Funds (Oct. 2025), at 29.

84. To be clear, the Morningstar Category definition does not qualify membership by glide-path label ("to" versus "through") or management style ("active" versus "passive"). Funds within the same Morningstar Category are constructed by Morningstar to be peer-comparable for purposes of performance, risk, and asset-allocation analysis, and are routinely used for those purposes by plan fiduciaries, retirement plan consultants, and courts. *See, e.g.*, *Snyder v. UnitedHealth Grp., Inc.*, No. CV 21-1049 (JRT/BRT), 2021 WL 5745852, at *4 (D. Minn. Dec. 2, 2021) ("the Morningstar Comparators constitute meaningful benchmarks because they fall within the same universe, and incorporate similar purposes, asset allocations, and risk exposure as the [challenged] TDFs").

85. Even American Century itself acknowledges this peer-group framework: on its public-facing marketing materials for the AC TDF series, American Century directly compares the One Choice In Retirement I Class fund (ATTIX), an actively managed "to-retirement" series, against the Fidelity Advisor Freedom 2015 I Class fund (FFVIX), an actively managed "through-retirement" series, on standard deviation, Sharpe Ratio, downside capture, and one-, five-, ten-, fifteen-, and twenty-year total returns over the period November 1, 2007 through

December 31, 2025.[16] For some period of time before and at least through October 7, 2024, AC compared their TDF series to the American Funds TDF in their marketing materials on their website.[17] At all relevant times, American Century itself has marketed the AC TDFs by comparing its series to those of its competitors without regard for the superficial "to" or "through" labels.

86. The actual economic characteristics are what matter to prudent fiduciaries, not superficial labels. The AC TDFs align with the comparator series on retirement-date equity exposure, sequence-of-returns risk, fixed-income duration, and benchmark co-movement.

87. As another example, sequence-of-returns risk is most acute in the years just before and after retirement. A market drop in that window, paired with ongoing withdrawals, can leave a portfolio that never recovers—even though the same returns in a different order would have been harmless. What controls that risk is not a fund's "to" or "through" label but its equity allocation in the window. As noted above, at retirement, the AC TDF holds 45% equity. BlackRock LifePath holds 40%. The TRP TDF holds 42.5%. American Funds holds 46%. Vanguard holds 50%. The AC TDFs sit in the middle of that band. A participant in the AC TDF retiring in 2030

---

[16] American Century Investments, *One Choice Target Date Portfolios*, https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-target-date-portfolios/ ("One Choice is represented by the American Century One Choice In Retirement I Fund. The Aggressive Target Date Fund (TDF) is represented by Fidelity Advisor Freedom 2015 I.") (last accessed April 27, 2026).

[17] *See* https://web.archive.org/web/20241012082448/https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-target-date-portfolios/ (last accessed July 18, 2026)

bears the same market exposure and sequence-of-returns risk as a participant in any of the four comparator series.

88. The AC TDF's bond-sleeve interest-rate risk is also typical for its category. The AC TDF's effective duration for the Class Period lands in the middle of the pack when compared to the four comparator series:

89. Upon information and belief, Defendants still have not removed the AC TDF despite its severe underperformance. ERISA required Defendants to remove it as soon as the available data showed it was an imprudent investment, here no later than 2020. *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015).

**B. Defendants' Failure to Follow a Prudent Process in Retaining the AC TDF Series**

90. Defendants retained the AC TDF from 2015 through at least the end of 2024.

91. Defendants retained the AC TDF despite readily available, then prevailing, information (available both prior to and throughout the Class Period) which indicated dramatically inferior performance, investment manager metrics, and lower performance in risk adjusted metrics.

92. In other words, examining the information available to the Fiduciaries in 2020, a fiduciary following the minimum standard of care for prudent investors, when evaluating whether to continue to retain the AC TDF series would have determined that its investment performance was inferior, its risk-adjusted

performance was inferior, and that its glide path and investment philosophy were being rejected by the data and the market, and thus would have removed the AC TDF by early 2020, at the latest.

93. For example, for several years prior to and continuing throughout the Class Period, the AC TDF has consistently underperformed other target date series options and the alternatives that AC used as a benchmark themselves.[18]

94. Specifically, under the circumstances prevailing in 2020, when confronted with the information that the AC TDF at the end of 2018 and 2019 had consistently underperformed in 3- and 5-year returns as well as MPT manager, risk, and cost metrics, a prudent fiduciary following the standard of care for prudent investors would not have decided to continue to retain the AC TDF throughout 2020.

95. Figure 6 below provides a summary of 3- and 5-year investment returns and metrics underperformance compared to industry leading available alternative target date series (described in more detail below) in 2018 and 2019. Over those two years, available data showed that AC TDF underperformed in 3- and 5-year lookback metrics against four industry leading TDFs in 96% of time periods in available data.

---

[18] It is worth noting that for some period of time prior to and at least through October 7, 2024, AC compared their TDF series to the American Funds TDF in their marketing materials on their website. *See* https://web.archive.org/web/20241012082448/https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-target-date-portfolios/ (last accessed July 18, 2026). As of July 18, 2026, however, they have removed that comparison and now compare to a Fidelity series. *See* https://www.americancentury.com/advisors/client-conversations/target-date-solutions/one-choice-target-date-portfolios/ (last accessed July 18, 2026).

The AC TDF therefore consistently underperformed for 6 years by the end of 2019 across all metrics (just prior to the start of the Class Period).

**Figure 6**

**Performance Metrics Comparison Summary January 2018 - December 2019**

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics Underperformed | Percentage of Metrics Underperformed |
|---|---|---|---|
| 3 - Year Return | 56 | 56 | 100% |
| 5 - Year Return | 24 | 24 | 100% |
| Sharpe Ratio - 3 - Year | 56 | 54 | 96% |
| Sharpe Ratio - 5 - Year | 24 | 20 | 83% |
| Information Ratio 3 - Year | 56 | 56 | 100% |
| Information Ratio 5 - Year | 24 | 24 | 100% |
| Alpha 3 - Year | 56 | 55 | 98% |
| Alpha 5 - Year | 24 | 20 | 83% |
| Sortino Ratio - 3 - Year | 56 | 55 | 98% |
| Sortino Ratio - 5 - Year | 24 | 21 | 88% |
| Batting Average 3 - Year | 56 | 55 | 98% |
| Batting Average 5 - Year | 24 | 22 | 92% |
| Turnover Ratio | 54 | 50 | 93% |
| **Total** | **534** | **512** | **96%** |

96. Given AC TDF's underperformance in 512 out of 534 (96%) of reviewed data points for each metric[19] examining 3- and 5-year lookbacks, the Fiduciaries had no reason to expect AC TDF to improve or outperform during the Class Period starting in 2020. Unsurprisingly, failure to remove AC TDF in 2020 based on this information resulted in millions of dollars of harm to the Plan. Figure 7 below calculates approximate losses to the Plan incurred due to Defendants' failure

[19] Each metric is analyzed using dozens of snapshot-level data points available for the time period between January 2018 through December 2019.

to replace the AC TDF with a more prudently selected and investable comparator TDFs.

**Figure 7**

**Approximate Performance Losses January 1, 2020 to December 31, 2025**

| Investment Name | Approximate Performance Losses ($) vs. Comparators |
|---|---|
| American Funds Target Date Retirement Series R6 | -$45,176,287 |
| Vanguard Target Retire Series Trust II | -$28,089,011 |
| T Rowe Price Ret Series Trust A | -$41,356,554 |
| BlackRock LifePath Index Series Trust T | -$27,261,463 |

97. A prudent fiduciary following the standard of care under the circumstances then prevailing in 2020 (including the examination of 2018 and 2019 3- and 5-year lookback data) would have evaluated the AC TDF series against, at a minimum, the investable market-leading TDF benchmarks identified above, under the MPT accepted investment metrics set forth below and, regardless of which combination of reasonable benchmarks and metrics chosen, a fiduciary acting under the prudent investor standard under the circumstances then prevailing in 2020, **could not have concluded that it was prudent to continue to retain the AC TDF series** unless they employed a flawed process.

98. Similarly, the table below illustrates that the details of the AC TDF series underperformance[20] when evaluated using several investment metrics that are commonly used, accepted, and required by MPT and the Prudent Investor Standard.

[20] "Underperformance" in this context includes both commonly accepted investment manager metrics as well as the investment returns.

Using these commonly accepted and required metrics for comparison demonstrates that a prudent process would have revealed the AC TDF series' consistent underperformance under all metrics, removed it in early 2020, and avoided the harm caused to the Plan.

99. A prudent process would have also removed the AC TDF prior to the Class Period, but at the latest, and more relevant to this action, in 2020. Every subsequent month, quarter, or year that the Fiduciaries failed to remove this option was a result of imprudence because the AC TDF series underperformed a shocking 96% of commonly accepted MPT metrics of 3- and 5-year lookbacks in 2020[21].

100. In fact, by the end of 2018 it would have been evident through a prudent process that under the circumstances then prevailing, the available information revealed that across all categories of metrics, whether return/performance metrics, risk-adjusted performance metrics, fee metrics, and others, the AC TDF provided no advantages over its peers.

101. In 2020 the picture was no different. As set forth below, the available data and information in 2020 mandates a conclusion that a prudent fiduciary examining AC TDF past performance would have removed the AC TDF from the Plan by 2020 at the latest. The Plan Fiduciaries' failure to do so necessitates an inference that they employed an imprudent process for several years.

[21] The most relevant available information back in 2020 was 2019 and 2018 lookback performance.

102. These facts also necessitate the further inference that regardless of whether Defendants weighed one category of MPT metrics over another, all available information at the time required them to remove the AC TDF and select a better performing TDF alternative.

103. Nevertheless, from 2015 through 2024, Defendants failed to eliminate the AC TDF series from the plan, retaining roughly half of the Plan's assets in the demonstrably underperforming and imprudent AC TDF for more than nine years.

104. Fiduciaries following a prudent process would not have ignored AC TDF's underperformance across all types of metrics as compared to better available options. This is further emphasized by the fact that **the comparator TDFs are established industry leaders**, and among the top 5 most selected options that any prudent fiduciary would be aware of and would compare their selected TDF against. In other words, Plaintiff did not cherry pick fringe or unproven peers for comparison.

105. A prudent process would have uncovered AC TDF's poor performance against established peers.

106. The tables in Figures 8-11 below illustrate an analysis of several of the most important and commonly accepted investment performance metrics incorporated into the Prudent Investor Standard when comparing the AC TDF series to other available alternatives on an annual basis.

107. Each column of each table represents the circumstances at the end of each calendar year that the Plan Fiduciaries would have had available to them, and should have used to compare the AC TDF series to meaningful and available alternative series had they employed a prudent process to determine whether to retain the AC TDF series.

108. For each metric comparison, if the AC TDF series underperformed more than 50% of the time, the metric is highlighted in red. If, as is rarely the case, the AC TDF series metric underperformed less than 50% of the time, the metric is highlighted in green and if the metric is unavailable, it is left blank.

109. As illustrated in Figure 8 below, when compared on a TDF series-to-series basis, the AC TDF series underperformed the American Funds Target Date series under all metrics looking back 3- and 5-years. The chart below demonstrates that in 2020, if the Fiduciaries reviewed AC TDF's performance looking back 3- and 5-years across MPT metrics at the end of 2019, they would have found that the AC TDF underperformed 100% of the time each year under each metric.

**Figure 8**

**American Century Target Date Series I vs American Funds Target Date Retirement Series R6: Percentage of Metrics AC Underperformed**

| | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | | 100% | 100% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | | 100% | 100% |
| Alpha 3 - Year | 100% | 100% | 100% |
| Alpha 5 - Year | | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | | 100% | 100% |
| Batting Average 3 - Year | 100% | 100% | 100% |
| Batting Average 5 - Year | | 100% | 100% |
| Turnover Ratio | 100% | 100% | 100% |

110. Similarly, as shown in Figure 9, when compared on a series-to-series basis, the AC TDF series underperformed the T. Rowe Price Target Date Series ("TRP") under every metric analyzed when looking back 3- and 5-years 100% of the time each year under each metric, except Turnover Ratio, which underperformed 93% of the time.

## Figure 9

**American Century Target Date Series I vs T Rowe Price Ret Series Trust A: Percentage of Metrics AC Underperformed**

| | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | | 100% | 100% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | | 100% | 100% |
| Alpha 3 - Year | 100% | 100% | 100% |
| Alpha 5 - Year | | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | | 100% | 100% |
| Batting Average 3 - Year | 100% | 100% | 100% |
| Batting Average 5 - Year | | 100% | 100% |
| Turnover Ratio | 86% | 100% | 93% |

111. Likewise, the AC TDF series underperformed the Vanguard Target Retirement Series ("Vanguard") under all metrics, except 2019 Turnover Ratio, analyzed looking back 3- and 5-years from the end of 2018 and 2019.

**Figure 10**

**American Century Target Date Series I vs Vanguard Target Retire Series Trust II: Percentage of Metrics AC Underperformed**

| | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 86% | 93% |
| Sharpe Ratio - 5 - Year | | 67% | 67% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | | 100% | 100% |
| Alpha 3 - Year | 100% | 100% | 100% |
| Alpha 5 - Year | | 67% | 67% |
| Sortino Ratio - 3 - Year | 100% | 86% | 93% |
| Sortino Ratio - 5 - Year | | 83% | 83% |
| Batting Average 3 - Year | 100% | 100% | 100% |
| Batting Average 5 - Year | | 100% | 100% |
| Turnover Ratio | 100% | 40% | 75% |

112. In that same vein, the AC TDF series underperformed the BlackRock LifePath Index Target Retirement Series ("BlackRock") under all metrics looking back 3- and 5-years from the end of 2018 and 2019.

**Figure 11**

**American Century Target Date Series I vs BlackRock LifePath Index Series Trust T: Percentage of Metrics AC Underperformed**

| | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 86% | 93% |
| Sharpe Ratio - 5 - Year | | 67% | 67% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | | 100% | 100% |
| Alpha 3 - Year | 100% | 86% | 93% |
| Alpha 5 - Year | | 67% | 67% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | | 67% | 67% |
| Batting Average 3 - Year | 86% | 100% | 93% |
| Batting Average 5 - Year | | 67% | 67% |
| Turnover Ratio | 100% | 100% | 100% |

113. A prudent fiduciary examining the AC TDF in 2020, under the circumstances then prevailing, would have recognized this dramatic level of underperformance compared to industry leading available alternatives, considered it holistically under accepted MPT metrics, and removed the AC TDF in 2020.

114. In other words, prudent fiduciaries utilizing a prudent process incorporating commonly accepted performance evaluation metrics required by MPT would not have retained the AC TDF series in 2020.

115. Ultimately a prudent process would have evaluated the retention of the selected AC TDF in relation to at least the available industry leading alternatives. Such a comparison would have revealed only one prudent choice: to remove the AC TDF in 2019 or, at the latest, 2020, because it provided no advantages against

available alternatives in 3- and 5-year lookbacks in multiple years. Defendants' failure to do so raises the inference that Defendants did not employ a prudent process in selecting and monitoring their TDFs.

### C. Defendants' Failure to Perform a Vintage-to-Vintage Comparison Against Industry Leading TDFs

116. As outlined above, a prudent fiduciary examining the AC TDF in 2019 and 2020 (under the circumstances then prevailing) would not have continued to retain the AC TDF in light of the dramatic level of underperformance compared to industry leading available alternatives on a series-to-series basis.

117. But while the results of the series-level comparisons make clear that conducting a vintage-to-vintage comparison would likely also reveal significant underperformance, a prudent fiduciary would have nonetheless completed a vintage-to-vintage comparison as well to confirm.

118. Unsurprisingly, the vintage-to-vintage comparison likewise would have illustrated the AC TDF's substantial underperformance under the circumstances then prevailing in 2019 and 2020 (2018 and 2019 data).

119. Each of the comparable AC TDF series vintages also underperformed when evaluated by the commonly accepted MPT metrics (Sharpe, Sortino, Alpha, etc.).

120. Appendix A to this Complaint sets forth the comparison of every comparable vintage of the AC TDF series to the same vintage for available industry

leading alternative TDF series options, broken down by performance as compared to the commonly accepted MPT metrics.

121. The standard of care for selection and monitoring investments for a plan the size of the Plan would require quarterly reviews of the investment performance of selected options. Accordingly, the Plan Fiduciaries would have had a minimum of four opportunities (each quarter in 2019) to remove the AC TDF series based on the 2018 performance and by the Q1 2020 quarterly meeting the Plan Fiduciaries would have had metrics for all of 2018 and 2019 providing the absolute latest time by which the AC TDF series should have been removed. Had the Fiduciaries conducted a prudent analysis, they would have removed the AC TDF when the plan changes were implemented in 2019.

122. For each AC TDF vintage, the tables in Appendix A provide the investment metrics identified throughout this Complaint for the two years immediately preceding the Class Period, which was the most up to date data available to the fiduciaries in 2020. If the AC TDF series vintage underperformed, then the metric is highlighted in red. If the AC TDF series vintage outperformed, the metric is highlighted in green, and ties are left white. When data is not available the space is left blank. The 2030 vintage comparison against American Funds from Appendix A is set forth below as Figure 12.

**Figure 12**

American Century One Choice 2030 Tr I

| | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 4.82% | 8.63% |
| 5 - Year Return | | 6.26% |
| Sharpe Ratio - 3 - Year | 0.583 | 0.994 |
| Sharpe Ratio - 5 - Year | | 0.749 |
| Information Ratio 3 - Year | -0.989 | -1.208 |
| Information Ratio 5 - Year | | -0.648 |
| Alpha 3 - Year | -0.69% | -0.42% |
| Alpha 5 - Year | | -0.11% |
| Sortino Ratio - 3 - Year | 0.805 | 1.474 |
| Sortino Ratio - 5 - Year | | 1.153 |
| Batting Average 3 - Year | 0.361 | 0.361 |
| Batting Average 5 - Year | | 0.450 |
| Turnover Ratio | 16.00 | 27.00 |

123. Figure 13, below, provides the investment metrics for the comparable vintage benchmark and, as above, if the comparable vintage benchmark outperformed the AC TDF series benchmark, then the metric is highlighted in green, with underperformance highlighted in red and ties left white. The 2030 vintage comparison against American Funds from Appendix A is set forth below.

**Figure 13**

**American Funds 2030 Trgt Date Retire R6**

| | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 6.92% | 10.86% |
| 5 - Year Return | 5.63% | 8.07% |
| Sharpe Ratio - 3 - Year | 0.777 | 1.157 |
| Sharpe Ratio - 5 - Year | 0.639 | 0.853 |
| Information Ratio 3 - Year | 0.470 | 0.568 |
| Information Ratio 5 - Year | 0.790 | 0.537 |
| Alpha 3 - Year | 0.70% | 0.89% |
| Alpha 5 - Year | 1.10% | 0.77% |
| Sortino Ratio - 3 - Year | 1.135 | 1.766 |
| Sortino Ratio - 5 - Year | 0.987 | 1.352 |
| Batting Average 3 - Year | 0.611 | 0.611 |
| Batting Average 5 - Year | 0.617 | 0.583 |
| Turnover Ratio | 8.00 | 0.00 |

124. And finally, Figure 14 provides the difference for each performance metric, with AC TDF series vintage underperformance highlighted in red, outperformance in green, and ties also left green. The 2030 vintage comparison against American Funds from Appendix A is set forth therein.

**Figure 14**

**American Century One Choice 2030 Tr I & American Funds 2030 Trgt Date Retire R6 Comparison**

| | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 2.10% | 2.23% |
| 5 - Year Return | | 1.81% |
| Sharpe Ratio - 3 - Year | 0.193 | 0.163 |
| Sharpe Ratio - 5 - Year | | 0.104 |
| Information Ratio 3 - Year | 1.459 | 1.777 |
| Information Ratio 5 - Year | | 1.185 |
| Alpha 3 - Year | 1.39% | 1.31% |
| Alpha 5 - Year | | 0.87% |
| Sortino Ratio - 3 - Year | 0.330 | 0.292 |
| Sortino Ratio - 5 - Year | | 0.199 |
| Batting Average 3 - Year | 0.250 | 0.250 |
| Batting Average 5 - Year | | 0.133 |
| Turnover Ratio | -8.00 | -27.00 |
| # of Underperforming Metrics | 7 | 13 |
| # of Total Metrics | 7 | 13 |
| % of Underperforming Metrics | **100%** | **100%** |

125. As the 2030 comparison example demonstrates, AC TDF 2030 underperformed the American Funds 2030 in all metrics in both 2018 and 2019, which represents the data available to the Fiduciaries in 2020.

126. Appendix A to this Complaint provides the same charts demonstrating underperformance across the industry-leading comparator TDFs across the 2030-2060 vintages.

127. Thus, a fiduciary following a prudent process would have reviewed at least vintage-based information as of in 2020, determined that it was imprudent to continue to retain the AC TDF series and removed it.

128. Despite all the metrics and performance data imploring the Fiduciaries to remove the underperforming AC TDF series, the Plan Fiduciaries not only failed

to remove the AC TDF series prior to the Class Period, but also in 2020, and retained it through at least the end of 2024.

129. As a direct result of this conduct, the Plan participants have suffered investment losses of tens of millions of dollars.

**D. Defendants' Imprudence is Evident Even When the AC TDF Series is Compared Only to Structurally Identical TDF Alternatives**

130. Even assuming *arguendo* that a prudent fiduciary may narrow the universe of alternative investments to only those TDFs which share identical labels and a close to identical glide path as their formerly selected funds—fiduciary decision subject to challenge in itself given the TDF market landscape—the outcome does not change. For several years prior to and continuing throughout the Class Period, the AC TDF also consistently underperformed multiple identically labeled "active" "to" TDFs, the MFS Lifetime Series R6 (the "MFS Lifetime"), and the PIMCO RealPath Blend Series Institutional (the "PIMCO RealPath"), as well as the arguably even more conservative "passive" "to" approach of the BlackRock LifePath Series (*See supra* ¶¶ 52, 75, 84-85, 92, and 117; *infra* ¶¶ 154 and 166).

131. Both the PIMCO RealPath and the MFS Lifetime start with slightly higher equity allocation 90% and 95% as compared to AC TDF's 85% and both have

lower equity allocations at and near retirement vintages[22]. Accordingly, AC TDF has higher equity allocation when it is least desirable—at or near retirement.

132. These funds even under the narrowest formulation of comparability are comparable because they are structurally and functionally interchangeable—sharing the same glide-path classification and asset-allocation approach to the AC TDF.

133. Figure 15 below provides a summary of 3- and 5-year investment returns and metrics underperformance compared to the MFS Lifetime Series R6 and the PIMCO RealPath Blend Series Institutional in 2018 and 2019. Over those two years, available data showed that AC TDF underperformed in 3- and 5-year lookback metrics against four identically classified TDFs in 93% of time periods in available data. The AC TDF therefore consistently underperformed these structurally fungible comparators for 6 years by the end of 2019 across all metrics (just prior to the start of the Class Period).

[22] MFS Lifetime reaches below 30% equity allocation at retirement and PIMCO RealPath reaches below 40% equity allocation at retirement, while AC TDF reaches 45% equity allocation at retirement.

**Figure 15**

Performance Metrics Comparison Summary January 2018 - December 2019

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics Underperformed | Percentage of Metrics Underperformed |
|---|---|---|---|
| 3 - Year Return | 13 | 13 | 100% |
| 5 - Year Return | 6 | 6 | 100% |
| Sharpe Ratio - 3 - Year | 13 | 13 | 100% |
| Sharpe Ratio - 5 - Year | 6 | 6 | 100% |
| Information Ratio 3 - Year | 13 | 13 | 100% |
| Information Ratio 5 - Year | 6 | 6 | 100% |
| Alpha 3 - Year | 13 | 13 | 100% |
| Alpha 5 - Year | 6 | 6 | 100% |
| Sortino Ratio - 3 - Year | 13 | 13 | 100% |
| Sortino Ratio - 5 - Year | 6 | 6 | 100% |
| Batting Average 3 - Year | 13 | 12 | 92% |
| Batting Average 5 - Year | 6 | 6 | 100% |
| Turnover Ratio | 14 | 6 | 43% |
| **Total** | **128** | **119** | **93%** |

134. Given AC TDF's underperformance in 119 out of 128 (93%) of reviewed data points for each metric[23] examining 3- and 5-year lookbacks, the Fiduciaries had no reason to expect AC TDF to improve or outperform these comparators during the Class Period starting in 2020. Figure 16 below calculates approximate losses to the Plan incurred due to Defendants' failure to replace the AC TDF with any of these prudently selected and investable comparator TDFs.

[23] Each metric is analyzed using dozens of snapshot-level data points available for the time period between January 2018 through December 2019.

**Figure 16**

**Approximate Performance Losses January 1, 2020 to December 31, 2025**

| Investment Name | Approximate Performance Losses ($) vs. Comparators |
|---|---|
| MFS Lifetime Series R6 | -$51,559,198 |
| PIMCO RealPath Blend Series Institutional | -$53,828,534 |

135. Accordingly, even considering an improperly narrowed comparability view, considering only a very limited sub-portion of the TDF universe against "active" "to" TDFs the data then available would have required a prudent fiduciary to remove the AC TDFs.

136. Regardless of which combination of reasonable benchmarks and metrics chosen, a fiduciary acting under the prudent investor standard, under the circumstances then prevailing in 2020, could not have concluded that it was prudent to continue to retain the AC TDF series over the "active" "to" comparator TDFs unless they employed a flawed process.

137. Similarly, the table below illustrates the details of the AC TDF series underperformance[24] when evaluated using several investment metrics that are commonly used, accepted, and required by MPT and the Prudent Investor Standard. Using these commonly accepted and required metrics for comparison demonstrates that a prudent process would have revealed the AC TDF series' consistent

[24] "Underperformance" in this context includes both commonly accepted investment manager metrics as well as the investment returns.

underperformance of other “active” “to” TDFs and removed the AC TDF in early 2020, and avoided the harm caused to the Plan.

138. A prudent process would have also removed the AC TDF prior to the Class Period, but at the latest, and more relevant to this action, in 2020. Every subsequent month, quarter, or year that the Fiduciaries failed to remove this option was a result of imprudence because the AC TDF series even underperformed 93% of commonly accepted MPT metrics of 3- and 5-year lookbacks in 2020[25] against funds with shared structural characteristics.

139. AC TDF’s underperformance across all types of metrics as compared to all types of better available options could not have been ignored by Fiduciaries following a prudent process.

140. The tables in Figures 17-18, below, illustrate an annualized analysis of several of the most important and commonly accepted investment performance metrics incorporated into the Prudent Investor Standard when comparing the AC TDF series to available structurally equivalent alternatives—MFS Lifetime and PIMCO RealPath.[26]

[25] The most relevant available information back in 2020 was 2019 and 2018 lookback performance.

[26] As defined elsewhere in this Complaint, for each metric comparison, if the AC TDF series underperformed more than 50% of the time, the metric is highlighted in red. If, as is rarely the case, the AC TDF series metric underperformed less than 50% of the time, the metric is highlighted in green and if the metric is unavailable, it is left blank.

141. Each column of each table represents the circumstances at the end of each calendar year that the Plan Fiduciaries would have had available to them, and should have used to compare the AC TDF series to meaningful and available alternative series had they employed a prudent process to determine whether to retain the AC TDF series.

142. As illustrated in Figure 17 below, when compared on a TDF series-to-series basis, the AC TDF series underperformed the MFS Lifetime Series R6 under all metrics except 2018 Turnover Ratio looking back 3- and 5-years. The chart below demonstrates that in 2020, if the Fiduciaries reviewed AC TDF's performance looking back 3- and 5-years across MPT metrics after the end of 2018 and 2019, e.g. prior to the beginning of the Class Period in 2020, they would have found that the AC TDF underperformed 100% of the time each year under each metric, except 3-Year Batting Average where it underperformed 92%, and 2018 Turnover Ratio.

**Figure 17**

**American Century Target Date Series I vs MFS Lifetime Series R6: Percentage of Metrics AC Underperformed**

| | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | | 100% | 100% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | | 100% | 100% |
| Information Ratio 3 - Year | 100% | 100% | 100% |
| Information Ratio 5 - Year | | 100% | 100% |
| Alpha 3 - Year | 100% | 100% | 100% |
| Alpha 5 - Year | | 100% | 100% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | | 100% | 100% |
| Batting Average 3 - Year | 83% | 100% | 92% |
| Batting Average 5 - Year | | 100% | 100% |
| Turnover Ratio | 0% | 86% | 43% |

143. Similarly, as shown in Figure 18, when compared on a series-to-series basis, the AC TDF series underperformed the PIMCO RealPath under every metric, except 5-Year Batting Average and Turnover Ratio, analyzed when looking back 3- and 5-years.

**Figure 18**

**American Century Target Date Series I vs PIMCO RealPath Blend Series Institutional: Percentage of Metrics AC Underperformed**

| | 2018 | 2019 | Total 2018-2019 |
|---|---|---|---|
| 3 - Year Return | 100% | 100% | 100% |
| 5 - Year Return | | 83% | 83% |
| Sharpe Ratio - 3 - Year | 100% | 100% | 100% |
| Sharpe Ratio - 5 - Year | | 50% | 50% |
| Information Ratio 3 - Year | 100% | 83% | 92% |
| Information Ratio 5 - Year | | 83% | 83% |
| Alpha 3 - Year | 100% | 100% | 100% |
| Alpha 5 - Year | | 50% | 50% |
| Sortino Ratio - 3 - Year | 100% | 100% | 100% |
| Sortino Ratio - 5 - Year | | 50% | 50% |
| Batting Average 3 - Year | 67% | 83% | 75% |
| Batting Average 5 - Year | | 17% | 17% |
| Turnover Ratio | 0% | 33% | 17% |

144. A prudent fiduciary examining the AC TDF in 2020, under the circumstances then prevailing, would have recognized this dramatic level of underperformance compared to available structurally fungible alternatives, considered it holistically under accepted MPT metrics, and removed the AC TDF in 2020.

145. In other words, prudent fiduciaries utilizing a prudent process incorporating commonly accepted performance evaluation metrics required by MPT would not have retained the AC TDF series in 2020.

146. Ultimately a prudent process would have evaluated the retention of the selected AC TDF in relation to, even under the strictest standard, the MFS Lifetime, PIMCO RealPath, and the BlackRock LifePath (*supra* ¶¶ 52, 75, 84-85, 92, 117 and

135; *infra* ¶¶ 166). Such a comparison would have revealed only one prudent choice: to remove the AC TDF in 2020 because it provided no advantages against available alternatives in 3- and 5-year lookbacks in multiple years. Defendants' failure to do so raises the further inference that Defendants did not employ a prudent process in selecting and monitoring their TDFs on a series-to-series basis, even when imprudently restricting the analysis only to "active" "to" comparators of the AC TDF.

### E. Defendants' Failure to Perform a Vintage-to-Vintage Comparison Against Structurally Identical Comparators

147. Unsurprisingly, the vintage-to-vintage comparison likewise would have illustrated the AC TDF's substantial underperformance of structurally identical comparators under the circumstances then prevailing in 2020 (2018 and 2019 data).

148. Each of the comparable AC TDF series vintages also underperformed when evaluated by the commonly accepted MPT metrics (Sharpe, Sortino, Alpha, etc.).

149. For each AC TDF vintage, the tables in Appendix B provide the investment metrics identified throughout this Complaint for the two years immediately preceding the Class Period, which was the most up to date data available to the fiduciaries in 2020. If the AC TDF series vintage underperformed, then the metric is highlighted in red. If the AC TDF series vintage outperformed, the metric is highlighted in green, and ties are left white. When data is not available the

space is left blank. The 2030 vintage comparison against the MFS Lifetime from Appendix B is set forth below as Figure 19.

**Figure 19**

American Century One Choice 2030 I

| | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 4.82% | 8.63% |
| 5 - Year Return | | 6.26% |
| Sharpe Ratio - 3 - Year | 0.583 | 0.994 |
| Sharpe Ratio - 5 - Year | | 0.749 |
| Information Ratio 3 - Year | -0.989 | -1.208 |
| Information Ratio 5 - Year | | -0.648 |
| Alpha 3 - Year | -0.69% | -0.42% |
| Alpha 5 - Year | | -0.11% |
| Sortino Ratio - 3 - Year | 0.805 | 1.474 |
| Sortino Ratio - 5 - Year | | 1.153 |
| Batting Average 3 - Year | 0.361 | 0.361 |
| Batting Average 5 - Year | | 0.450 |
| Turnover Ratio | 16.00 | 27.00 |

150. Figure 20, below, provides the investment metrics for the comparable vintage benchmark and, as above, if the comparable vintage benchmark outperformed the AC TDF series benchmark, then the metric is highlighted in green, with underperformance highlighted in red and ties left white. The 2030 vintage comparison against MFS Lifetime from Appendix B is set forth below.

**Figure 20**

**MFS Lifetime 2030 R6**

| | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 6.50% | 10.60% |
| 5 - Year Return | 4.59% | 7.97% |
| Sharpe Ratio - 3 - Year | 0.720 | 1.108 |
| Sharpe Ratio - 5 - Year | 0.513 | 0.837 |
| Information Ratio 3 - Year | 0.260 | 0.753 |
| Information Ratio 5 - Year | 0.126 | 0.651 |
| Alpha 3 - Year | 0.22% | 0.41% |
| Alpha 5 - Year | 0.07% | 0.58% |
| Sortino Ratio - 3 - Year | 1.013 | 1.682 |
| Sortino Ratio - 5 - Year | 0.761 | 1.330 |
| Batting Average 3 - Year | 0.583 | 0.611 |
| Batting Average 5 - Year | 0.550 | 0.583 |
| Turnover Ratio | 19.00 | 18.00 |

151. And finally, Figure 21 provides the difference for each performance metric, with AC TDF series vintage underperformance highlighted in red, outperformance in green, and ties also left green. The 2030 vintage comparison against MFS Lifetime from Appendix B is set forth therein.

**Figure 21**

American Century One Choice 2030 I & MFS Lifetime 2030 R6 Comparison

| | 2018 | 2019 |
|---|---|---|
| 3 - Year Return | 1.67% | 1.97% |
| 5 - Year Return | | 1.72% |
| Sharpe Ratio - 3 - Year | 0.136 | 0.114 |
| Sharpe Ratio - 5 - Year | | 0.088 |
| Information Ratio 3 - Year | 1.249 | 1.961 |
| Information Ratio 5 - Year | | 1.298 |
| Alpha 3 - Year | 0.91% | 0.83% |
| Alpha 5 - Year | | 0.69% |
| Sortino Ratio - 3 - Year | 0.208 | 0.208 |
| Sortino Ratio - 5 - Year | | 0.177 |
| Batting Average 3 - Year | 0.222 | 0.250 |
| Batting Average 5 - Year | | 0.133 |
| Turnover Ratio | 3.00 | -9.00 |
| # of Underperforming Metrics | 6 | 13 |
| # of Total Metrics | 7 | 13 |
| % of Underperforming Metrics | **86%** | **100%** |

152. As the 2030 comparison example demonstrates, AC TDF 2030 underperformed the MFS Lifetime 2030 in all metrics in both 2018 and 2019, which represents the data available to the Fiduciaries in 2020.

153. Appendix B to this Complaint provides the same charts demonstrating underperformance across the 'to' and actively managed comparator TDFs, MFS Lifetime and PIMCO RealPath, across the 2030-2060 vintages.

154. Despite all the metrics and performance data imploring the Fiduciaries to remove the underperforming AC TDF series, the Plan Fiduciaries not only failed to remove the AC TDF series prior to the Class Period, but also in 2020, and retained

it through at least the end of 2024. Upon information and belief, the Defendants still have not removed the AC TDF despite its severe underperformance.

155. As a direct result of this conduct, the Plan participants have suffered investment losses of millions of dollars, even when hypothetically narrowing the field to only identically structured comparators.

## VII. CLASS ACTION ALLEGATIONS

156. Plaintiff brings this action on behalf of Plaintiff and the Class, which is defined as participants in and beneficiaries of the Plan but excluding Defendants and their immediate family members.

157. The Class Period includes the six years prior to the date of the filing of this Complaint through the date of judgment.

158. The members of the Class are so numerous, consisting of thousands of members, not including their spouse beneficiaries, who, upon information and belief, are sufficiently dispersed geographically such that joinder of all members is impracticable. The issues of liability are common to all members of the Class and are suitable to common resolution.

159. Plaintiff's claims are typical of the claims of other members of the Class because Plaintiff's claims arise from the same events, practices and/or courses of conduct described above.

160. Plaintiff's claims are also typical of the claims of other members of the Class because the relief sought consists of requiring Defendants to make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits to the Plan. Any such recovery from Defendants will be paid to the Plan and any relief will flow to all Class Members through their accounts in the Plan.

161. Plaintiff will fairly and adequately represent and protect the interests of the Class.

162. Plaintiff does not have any interests antagonistic to or in conflict with those of the Class.

163. Defendants have no unique defenses against Plaintiff that would interfere with Plaintiff's representation of the Class.

164. Plaintiff is represented by counsel experienced in prosecuting ERISA class actions and with particular experience and expertise in litigation involving ERISA breaches of fiduciary duty.

165. The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendants acted consistently with their obligations under ERISA as to the Plan as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or

varying adjudications that would establish incompatible standards of conduct relating to the Plan.

166. The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

167. The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole. This action challenges whether Defendants breached their fiduciary duties, which would be violations of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants breached their fiduciary duties. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly from the declaratory or injunctive relief or flow as a necessary consequence of that relief.

168. The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties to the Plan. As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies and damages will likewise predominate over any individual issues.

169. A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the Plan.

170. Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only

individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VIII. PLAN-WIDE RELIEF

171. ERISA authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a). See 29 U.S.C. § 1132(a)(2).

172. Indeed, ERISA breach-of-fiduciary duty actions generally hinge on the uniform conduct of plan fiduciaries with respect to the plan. *Hughes v. Nw. Univ.*, 595 U.S. 170, 176-77 (2022).

173. Plaintiff here seeks relief on behalf of the Plan, *i.e.*, in this case for all losses to the Plan caused by Defendants' breaches, and not only the losses to Plaintiff's individual account.

## IX. TIMELINESS

174. Within the six-year period prior to Plaintiff's filing this suit, Defendants violated one or more of their fiduciary obligations as described above.

175. Plaintiff did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Consequently, Plaintiff's claims in this action are timely under 29 U.S.C. § 1113.

**COUNT I: Breach of Fiduciary Duty of Prudence**
**(Against All Defendants)**

176. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

177. At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar as they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets. 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

178. ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments. 29 U.S.C. § 1104(a)(1)(B).

179. During the Class Period, Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan prudently and act with the care, skill, diligence, and prudence required by ERISA.

180. At all relevant times during the Class Period, Defendants breached their fiduciary duties of prudence in multiple respects by selecting and continuing to retain a severely underperforming TDF option across all metrics instead of removing it in favor of better and available options.

181. Based on reasonable inferences from the facts set forth in this Complaint, Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess before and during the Class Period whether the

Plan's AC TDF was a prudent choice for the Plan and to remove imprudent investment options regardless of how long those investments had been in the Plan.

182. During the Class Period, Defendants breached their fiduciary duties of prudence to Plan participants, including Plaintiff, by failing to engage in a prudent fiduciary process for monitoring the Plan's TDF and by failing to remove the imprudent AC TDF investment within a reasonable period.

183. Defendants were directly responsible for: evaluating and monitoring the Plan's investment options, including the AC TDF, in a prudent fashion; eliminating funds, such as the AC TDF, that underperformed under all metrics; and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

184. Defendants failed to employ a prudent fiduciary process by failing to monitor and evaluate the AC TDF in comparison to other meaningful benchmark TDFs.

185. Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their fiduciary duties of prudence under 29 U.S.C. § 1104(a)(1)(B).

186. As a result of the Defendants' breach of their fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered tens of millions of dollars in unreasonable and unnecessary monetary losses.

187. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the fiduciary breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breach of fiduciary duty alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

**COUNT II: Failure to Adequately Monitor Other Fiduciaries under ERISA (against the Company)**

188. Plaintiff repeats and realleges the allegations in the preceding paragraphs as if fully set forth herein.

189. The Company had the authority to appoint and remove members or individuals responsible for Plan investment management and was aware that these fiduciaries had critical responsibilities for the Plan.

190. In light of this authority, the Company had a duty to monitor those individuals responsible for Plan investment management to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

191. The Company had a duty to ensure that the individuals responsible for Plan investment management possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

a. The Company breached its duty to monitor individuals responsible for Plan investment management, by, among other things: Failing to monitor and evaluate the performance of individuals responsible for Plan investment management or have a system in place for doing so, standing idly by as the Plan suffered significant losses by maintaining the imprudent AC TDF for most of the Class Period;

b. Failing to monitor the process by which Plan TDF were evaluated, failing to investigate the suitability of the AC TDF, failing to investigate the availability of alternative, prudent TDFs; and

c. Failing to remove individuals responsible for Plan investment management whose performance was inadequate in that they

continued to maintain the AC TDF, all to the detriment of the Plan and Plan participants' retirement savings.

192. As a result of the foregoing breaches of the duty to monitor, the Plaintiff and Plan participants suffered unreasonable and unnecessary monetary losses amounting to tens of millions of dollars.

193. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor individuals responsible for Plan investment management. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## X. PRAYER FOR RELIEF

Wherefore Plaintiff prays that judgment be entered against Defendants on all claims, and requests that the Court order or award the following relief:

A. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint Plaintiff as class representative, and appoint Milberg, PLLC as class counsel;

B. Order Defendants to disgorge any profits they received as a result of the above breaches of fiduciary duty;

C. Impose a constructive trust over these profits;

D. Impose a monetary surcharge against Defendants and compel Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches

of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets in the AC TDF, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Plan participants would have made if the Defendants had fulfilled their fiduciary obligations by undertaking TDF suitability and comparative analyses on a timely basis;

E. Apportion all amounts recovered for the Plan among the Plaintiff and the Class;

F. Order that any amount to be paid to the Plan and/or account of Plaintiff and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability;

G. Require Defendants to pay attorneys' fees and the costs of this action pursuant to 29 U.S.C. § 1132(g)(1), or order the payment of reasonable fees and expenses to Plaintiff's counsel on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class in this action;

H. Award pre-judgment and post-judgment interest;

I. Award any other such relief the Court determines Plaintiff and the Class are entitled to pursuant to 29 U.S.C. § 1132(a); and

J. Award such other relief as the Court may deem just and proper.

DATED: July 18, 2026.

Respectfully submitted,

*/s/ John Heenan*
John Heenan
HEENAN & COOK
2224 Montana Ave.
Billings, MT 59101
Telephone: (406) 839-9091
john@lawmontana.com

Alexandr Rudenco*
**MILBERG, PLLC**
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
arudenco@milberg.com

Mark K. Gyandoh, Esquire*
James A. Maro, Esquire*
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Tel: (610) 890-0200
markg@capozziadler.com
jamesm@capozziadler.com

**Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiff and*
*the Prospective Class*